## Abbott *v*. Abbott, Appellant.

*Divorce—Indignities to the person—Domicil of libellant—Insufficient evidence.*

Where a party, never theretofore a resident of Pennsylvania, comes from another state and institutes an action for divorce against his wife who was never a resident of this State, for an alleged cause of action arising in another state, which cause of action is not cognizable as a cause for divorce in that state, the burden rests on the complainant to show by convincing evidence that he became a resident of this State with the intention of remaining therein and not for the purpose of securing a divorce. It is the duty of the court to examine carefully the evidence relating to residence, and to require that the good faith of the applicant in that respect should be satisfactorily established.

A libel for divorce should be dismissed for lack of jurisdiction where the evidence of libellant's domicil is vague, indefinite and inconsistent and not sufficient to establish a bona fide residence for the year preceding the date of the filing of libel.

In the trial of a libel in divorce on the ground of indignities to the person, the libellant must establish a course of conduct by specific acts of sufficient importance and quality to make out a case. Inferences, loose declarations, general allegations of ill temper and abusive conduct fall short of this obligation. General accusations of a nagging disposition, disagreeable conduct toward a relative of the libellant also do not constitute sufficient grounds for granting a divorce.

Argued October 8, 1920.   Appeal, No. 183, Oct. T., 1920, by respondent, from decree of C. P. No. 2, Phila. Co., Sept. T., 1917, No. 648, granting a divorce in the case of Charles A. Abbott v. Frances F. Abbott. Before ORLADY, P. J., PORTER, HENDERSON, TREXLER, KELLER and LINN, JJ. Reversed.

**484**          ABBOTT *v.* ABBOTT, Appellant.

Libel in divorce.  Before ROGERS, J.

The facts are stated in the opinion of the Superior Court.

The case was referred to Bertram D. Rearick, Esq., as master, who recommended a divorce.

On exceptions to the master's report the court dismissed the exceptions and granted a divorce.

*Errors assigned* were dismissing exceptions and the decree of the court.

*W. L. Shepperd* and *Harold G. Aron,* of *Aron & Wise,* and with them *Porter, Foulkrod & McCullagh,* for appellant.

*William Barclay Lex,* for appellee.

OPINION BY HENDERSON, J., March 5, 1921:

The original libel filed in this case charged the respondent with (1) cruel and barbarous treatment endangering her husband's life; (2) indignities to his person such as rendered his condition intolerable and life burdensome; (3) wilful and malicious desertion. The libel was subsequently amended by striking out the charge of cruel and barbarous treatment.  The case was heard before a master and a large volume of evidence was taken.  The charge of desertion was dismissed and a decree recommended in favor of the plaintiff for indignities to the person.  The report of the master was approved and a decree entered in favor of the appellant. The evidence taken is directed to the second and third causes of complaint.  The first question presented for consideration relates to the bona fides of the defendant's residence in Pennsylvania and the jurisdiction of the court to grant the decree.  The libel was filed September 14, 1917.  It averred that the libellant had been a resident of the State of Pennsylvania for one or more years previous to the filing of the libel.  The parties were mar-

ried in the City of Washington in August, 1897. Before that they had lived in the State of Georgia. After their marriage they moved to Boston where they remained until the spring of 1902, at which time they moved to the City of New York. They never lived in Pennsylvania, and all of the evidence offered relates to occurrences in Massachusetts and New York. The libellant testified that he came to Philadelphia in May, 1916, and rented a room in a lodging house at 1935 Green street where he remained "three or four months—six months, I guess." From there he moved to a rooming house at 2021 Green street where he had a room until February, 1918, at which time he took a room at 165 N. 15th street. While in Philadelphia, he took his meals "anywhere around town in restaurants." He paid for his rooms by the week. His business at that time was, selling automobile trucks for the White Company of Cleveland, Ohio. The field of his activity extended from Baltimore to Boston, and he first had his place of business in New York. In 1910 there was a change in management which took him out of New York "a good deal" especially during the last five or six years. This work took him where the company sent him —to Philadelphia every week, to the factory at Cleveland, to Providence and into Connecticut, or up into New York State—wherever business called him. He received his instructions from Cleveland where to go. These instructions were sent to him to New York or to Philadelphia. Those to Philadelphia were sent to 216 N. Broad street where the White Company had an agency. He maintained his bank account in New York, but had two trunks containing clothing, shoes and personal things in his room. When in New York he stayed at a club to which he belonged. He was registered as a voter in Philadelphia in September, 1917, and voted at the following election. In answer to the inquiry how often he occupied the rooms on Green street, his reply was: "I should say sometimes once a week and twice a week, but

not every week." In explanation he said: "When I moved to Philadelphia I was traveling, and when I went away I would take what clothing I needed." In further explanation he said: "I came over here to Philadelphia, when it was necessary. Our business was very slack, in fact for four years we didn't have any business to amount to anything." He had a room at Rockville Center, Long Island, in 1917. A witness, John R. Kendrick, Jr., a cousin and associate of the libellant and a resident of New York, testified that he was once at the apartment of the libellant at 1613 Green street, and was with him for part of an evening at 2021 Green street. Robert J. Howley, an employee of the White Company, testified that he thought he was once at the libellant's room at 1613 Green street, and that he was several times at 165 N. 15th street, and was also at 2021 Green street. There was no other corroborating evidence as to the fact or character of his actual occupancy of either of the rooms on Green street. The proprietor of the house on 15th street testified that he had a room there which he occupied over the week's end—he just slept there. As he did not take the room on 15th street until February, 1917, it was necessary that he establish a residence in the Green street rooms at least from the middle of September, 1916. It does not appear that he had social acquaintances in Philadelphia, nor does he produce any witnesses from either of the Green street houses to show the extent and character of his sojourn there. The evidence of Mr. Howley is directly contradicted by Detective Wilson who went to the office of the White Company in Philadelphia in September, 1918, to secure information in regard to the libellant. He testified that he met Mr. Howley at the office of the White Company on Broad street and inquired about Charles Abbott and was informed that there was a man of that name connected with the White Company who was a salesman in New York; that he was in New York or Cleveland; and that he travelled all over the country. The witness asked

Howley to give him his address to which the latter replied: "I don't believe I can, but we may have a record of him." He said: "It seems to me that at one time he lived on 15th street." Then after referring the question to a woman or girl in the office, he said to the witness: "No, we haven't any record of his address"; that he didn't get his mail there, but that he could be reached by writing to the company in New York, Cleveland or Boston, because he travels more out of New York and Boston than anywhere else. In reply to this evidence, Mr. Howley said that he understood the inquiry to be about George Abbott who had worked for the company. The same witness made investigation as to the houses on Green street and 15th street at which the libellant claimed to have had rooms and ascertained, as he stated, that there was no such number as 1935.Green street, and that there was no such number as 165 N. 15th street. In reply to this evidence the libellant was called, about two months afterward, and stated that the Green street address should have been 1613 instead of 1935; that he first discovered his error in looking over his receipts. In excuse of his mistake he said he wasn't there very long, only from May until about the middle of August. The mistake in the 15th street address he claimed was chargeable to the stenographer, but the transcript of the evidence discloses the same number in three different places in the libellant's examination. Further evidence bearing on the question of residence exists in the fact that when the libellant registered as a voter in Philadelphia in September, 1917, he made affidavit that the place of his residence at his last registration was 8th avenue and 55th street, New York City. The time of the registration was 1916. The respondent offered proof to show that the only registration week in 1916 in the State of New York commenced on Monday, October 9th, and ended Saturday, October 16th. This evidence was rejected by the master. Proof was thereupon offered of the New York statute governing elections, according to

which one week of every year is designated for the registration of voters—that week beginning on the twenty-ninth day preceding the November election, which by the statute is fixed for the first Tuesday after the first Monday of November of every year. This offer was rejected by the master on the ground that the registration in New York was a fact which obviously cannot be contradicted by testimony as to the law. Bearing on the question of residence was also the admission of the defendant that in February, 1918, he made an affidavit before May E. White, notary public, in New York, in which he stated: "During 1917 while Mrs. Pearson lived at Rockville Center, Long Island, I lived near her and frequently called on her, but did not spend any unusual time at her house because I came to New York to my place of business." Along the same line was the evidence of J. Harrison Bates who lived at Rockville Center, L. I. He was employed in the assessor's office and made up the assessment rolls for the town of Hempstead and Nassau County, L. I. He testified that he knew the libellant by sight—knew who he was; that he learned his name from the proprietor of the boarding house in the village where the libellant boarded; also from the libellant's chauffeur; that the boarding house referred to was diagonally across the street from where the witness lived and about seventy-five feet away; that the libellant and Mrs. Pearson boarded there; that they came about the first of April and remained at that boarding house about six weeks, and then rented a house adjoining his; that Mrs. Pearson went away on or about the first of January, 1918; that during the occupancy of the house last referred to, the witness saw the libellant and Mrs. Pearson nearly every day and that these visits continued until they closed the house about January, 1918. During all of this time the libellant had his room at the boarding house first referred to. He always stopped at Mrs. Pearson's in the evening when he came up from New York. This evidence the master considered of little weight be-

cause the witness only knew the libellant by repute and because of the irrelevancy of the subject-matter. In view of the objection to the jurisdiction of the court because of the nonresidence of the libellant, the evidence offered to show when registration could be made in New York in 1916 was not only competent, but important. If as proposed to be shown the registration occurred after the time when the libellant claimed to have become a resident of Philadelphia, his conduct in registering in New York was inconsistent with his present allegation that he was for more than a year prior to the filing of his libel a resident of the State of Pennsylvania. The presumption is that he could not be an elector in the State of New York while a resident of Pennsylvania, and the assertion of a right to vote by registering in the former state tends strongly to show that his claim of residence in Philadelphia was not made in good faith. Moreover, when asked whether he voted in New York at the presidential election in 1916, he testified that he didn't remember whether he voted or not; that his business took him out of the city much of the time and that he did not often vote. His answer in this respect is consistent with his declaration to the registration board in Philadelphia that his last place of registration was in New York City in 1916. It is worthy of notice that that was a year in which a president was elected and that if the attention of the libellant was ever drawn to an election he would be likely to recall whether he had voted at that time, but it is wholly inconsistent with the claim of residence in Pennsylvania that the witness should have been uncertain whether he had voted in New York at the election in 1916. This is further supported by the affidavit referred to in which he declared that he lived at Rockville Center, during 1917, and that his place of business was in New York. The libellant testified that he consulted an attorney in New York with reference to his difficulties with his wife and learned that the attorney could do nothing about it. Then he dropped it

until he came over to Philadelphia. After he moved to the city, he testified: "But seeing it was impossible for Mrs. Abbott to do anything in this matter, and not wanting my matrimonial relations to remain that way forever, I consulted another lawyer." At a later stage of the examination he was asked whether when he consulted the New York attorney consideration was given to the grounds for an action of divorce under the laws of that state. Objection was made to this question and the objection was sustained by the master. At a later time in the examination, the counsel for the respondent offered in evidence the New York code of civil procedure wherein the cause of divorce is limited to adultery. This offer was objected to and the objection sustained by the master. In view of the expressed desire of the libellant to change his matrimonial relations and his consultation with the New York attorney before he came to Philadelphia, we regard the inquiry whether the grounds of divorce established in New York were considered in his consultation with his attorney there important, as was also the evidence that adultery was the only cause recognized in that state. This evidence bears on the allegation of the respondent that the residence alleged by the libellant to establish the jurisdiction of the courts of Pennsylvania was not bona fide. Where a party never theretofore a resident of Pennsylvania comes from another state and institutes an action for divorce against his wife who was never a resident of this State for an alleged cause of action arising in another state, which cause of action is not cognizable as a cause for divorce in that state, the burden rests on the complainant to show by convincing evidence that he became a resident of the State with the intention of remaining therein and not for the purpose of securing a divorce, and it is the duty of the court to carefully examine the evidence relating to residence and to require that the good faith of the applicant in that respect be satisfactorily established. A consideration of the evidence here presented satisfies us

that the libellant has not discharged this burden. The evidence as to his use of the rooms occupied by him in the light of the other proofs in the case fails to convince us that he intended to make these lodging house rooms his home. He made no acquaintances there so far as has been shown. His mistakes in regard to the numbers of two of the houses required explanation, and none of the occupants of either of the premises, except the proprietor of the rooming house on 15th street, was called to give any evidence as to his presence there or as to the character of his tenancy. His own evidence is unconvincing in that he was there for a very small proportion of the time and had no different occupancy from that which he would have had had he occupied a room in a hotel with the ordinary baggage which a traveler intending to remain for a few weeks would have with him. His declaration as to registering in New York in 1916 and his affidavit as to his residence on Long Island during practically all of 1917 give support to the contention that such residence as he had in Philadelphia was transient and occasioned by his desire to procure a divorce. The explanation that he changed his residence on account of business is not supported by the other evidence in the case, but is rather contradicted thereby. He had a roving commission in a zone having its southern limit at Washington and its northern limit in Boston, assisting local agents of the White Company in the selling of automobile trucks. He drew his regular salary from the company in Cleveland. He shared commissions with the local agents whom he assisted in making sales. He travelled extensively in this work, and so far as may be inferred from the evidence and the nature of the business, New York was the center of his activities. That had been his home for many years; it was the place where his club memberships existed and where his familiar associates were, and apparently his time was principally spent there. It was incumbent on the libellant to satisfactorily explain the discrepancies in his

conduct and to remove the suspicion of an improper motive in coming to this State by the fullest and frankest inquiry as to the circumstances which induced him to that action.  The presence of the libellant in Philadelphia did not begin in 1916—his visits to the White office where Mr. Howley was employed began in 1912. Some of his mail came to that office in 1913 and 1914. Other portions of it went to the New York office and it may be concluded from the testimony of the libellant and Mr. Howley that it was received at other places as the business of the company by which they were employed was developed.  So far as may be determined from the conduct of the libellant his residence might be as easily established at the clubs which he frequented in New York as the lodging houses where he had his trunks and slept at week ends when in Philadelphia.  The exceptions to the report of the master relating to the proof of residence should have been sustained and the libel dismissed by the learned judge of the court below for lack of sufficient evidence of the bona fide residence of the libellant in the state for a year preceding the date of the filing of the libel.

After a careful examination of all of the evidence, we are of the opinion also that the libel should have been dismissed for lack of merit.  As before stated, it charged cruelty, indignities to the person and desertion, as originally filed.  All of these charges were set forth on oath by the libellant.  Before the case came to a hearing, the charge of cruelty was withdrawn and no evidence was presented tending in the slightest degree to support such charge except the libellant's statement that about sixteen years ago his wife once scratched him on the back.  Nor was there confirmation of the charge of desertion.  On the libellant's own admission, he left the apartment where he and his wife were living, November 29, 1915, and never returned thereto.  His explanation of their separation was that her son informed him that Mrs. Abbott wanted to see him, whereupon he

went to her room. He asked her what she wanted and "she commenced to rake me over the coals—I had been going up to my sister's at Bridgeport who was very ill—about that and about a dinner party we had at the Belmont hotel with some relatives and friends of mine, and she wanted to know why she wasn't invited and I told her she wasn't wanted. So she accused me of breaking all the marriage vows in the world. She said if you care to run around with other people you just pay my debts and get out—pay my bills and get out—and I said all right I will just do that, and I borrowed the money and did it. That is what happened." The respondent gave a different account of this interview. She says that she sent for her husband because of a report she had heard that he was spending much time with a Mrs. Pearson. She asked him whether he loved Mrs. Pearson, to which he replied: "I decline to answer." He said they had grown very close together; that the affair had been going on for years. She reproached her husband bitterly for his disloyalty to her, and told him that he hadn't played the game fairly; that he should not desert her for another woman, and throw her back as a dependent on her sons. He replied that he would give her $40 a week and divide his commissions with her and keep up his life insurance for her. Mr. Iverson testified that he heard the conversation and his testimony corroborates that of his mother as to the interview. He denied that his mother told the libellant to pay her bills and get out. The evidence is further supported by that of Miss Deremaux who testified that she related to Mrs. Abbott, on the 26th of November preceding the separation, a conversation she had had with the libellant in which he expressed strong admiration for Mrs. Pearson. This information Mrs. Abbott stated led to the conversation between her and her husband at the time of the separation. Whichever account of the interview is to be accepted, it is clear that there was no desertion by the wife. The learned master regarded it as a separation by agreement

and dismissed the charge of desertion without further comment, on the ground that the evidence did not show a wilful and malicious separation from her husband by the respondent.

The only ground of complaint left was indignities to the person. A bill of particulars was filed covering the charges of indignities and desertion, but this is expressed in such general terms as to give little information of specific acts on which the libellant depended to make out a case. The only relevant portion of the bill of particulars relating to the charge of desertion is that the respondent barred herself from the libellant and would have no further communication with him. This is not supported by the evidence, and it must be held as wholly failing to sustain the accusation in this respect. The particulars relating to indignities to the person are without specifications of times, places or facts and give little more information than the general charge in the libel. The testimony of the libellant is scarcely less vague, general and indefinite than is the complaint in the libel and the bill of particulars. In general terms the accusation was that the respondent began a course of nagging and harassing the libellant which continued up to the time of the alleged desertion; that she insisted the libellant maintain a standard of living far in excess of his means, and insisted from time to time on increase after increase of expenditures so that his household expenses always increased in a greater ratio than his income; that respondent insisted that her son, James Iverson, should live with them, and his presence caused unending friction between the libellant and respondent in which the latter always took the side of her son; that the maintenance of her son devolved on the libellant who had been compelled to support him in idleness; that the marital troubles of the parties were immensely augmented and greatly increased by the interference of the son and by his encouraging the respondent to combat the libellant; that the respondent was ad-

dicted to the use of habit forming drugs, and was during her entire married life under their effect; that she accused the libellant of improper relations with other women; that she repeatedly and frequently and continuously informed the libellant that she loathed and despised him. It is evident from the examination of the libellant's testimony that he indulged in an extravagant and exaggerated description of his wife's conduct, if there were no other facts to sustain his case than those disclosed therein. The facts referred to by the libellant and the witnesses called to support him are said to have occurred during the course of about eighteen years and are so detached and in most instances so unimportant as to leave the impression that they were not the impelling motive which induced the libellant to institute this proceeding. General statements which were apparently his own inferences or conclusions constitute a large part of the libellant's evidence. He said: "She told me on numerous occasions that we ought to separate; that she hated me; that I never would do anything for her; she always made me feel that I was the one who pulled the family down. I have often been humiliated before waiters or other people—she didn't like the food or the waiters or anything, and she would get up and leave the table and go upstairs. She told me millions of times that she cared nothing for me—didn't like me— that we ought to separate. That got to be an old, old story." In answer to the question give one particular quarrel, state where it occurred, what occurred, what she said and what you said, he replied: "I cannot give you those dates. It is out of the question because it was so often. There was always a constant bickering about them. I cannot think back just to the exact time." One of the instances enumerated was when the libellant's sister was at the house, and his wife was going out to play cards. The libellant sat up and chatted with his sister and played the piano and sat in the dining room and had a couple of bottles of beer, and his wife came

home and saw him and his sister talking, and she said if she couldn't entertain her own husband she would go to bed and she went. Meals never suited; she never could get anything to eat, and she was very disagreeable to my sister and to me and everybody at the table. "Q. What did she say to them and to you? A. You can do more by not saying anything sometimes than by talking. It was more her attitude. Q. What did she do? A. She didn't like anything about the place, the food was bad, the service was bad, and everything else. Q. How do you know that she didn't like it? A. By just looking at her. She would refuse to eat the stuff that we had to eat and she would tell me that the place was terrible. She was always displeasing to Belle, and said she loathed the family, and hated me and hated us all, and that was all the time. There was no let up to it." According to his story, he furnished frequent medical service for his wife. "Q. For your wife? A. Yes, I had nothing but physicians—almost millions of them." He lived on 34th street, had a two years' lease of his place "and it was so disagreeable for millions of reasons, debts and everything else I cancelled the lease and we went to Governor's Island to my sister's." One of the instances shown by the testimony of the libellant's witness, John R. Kendrick, Jr., related to a dinner in New York soon after the parties came there in 1902. The place was the Hoffbrau. The incident was not mentioned by the libellant in his first examination, but was introduced by Mr. Kendrick. It seems to have been a family party. The persons present were the complainant, the libellant, Kendrick, his brother Lawton and the latter's wife, Juliet and Florence, sisters of Kendrick. They were all drinking, and Lawton's wife started to abuse her husband, accusing him of various things, whereupon, as stated by the witness, Mrs. Abbott started to abuse her husband talking in a loud voice. Finally she and Lawton's wife withdrew from the company. At a later time in the examination, the complainant gave an account of the occurrence:

"We went over there to have some drinks. It was up-stairs. Catherine and Lawton started the battle, and Mrs. Abbott gave us all a beautiful bawling out. Q. What was her language? A. As I told you, it was one of so many of those incidents that I cannot remember just now. She reproached us all, said that we were drinking and making too much noise, or something of that kind, I have forgotten that now, and she and Catherine said: 'Let's get out of here and leave them,' and so they got up with this other girl and they flounced out with this girl, leaving us all there together, and when I got home she was very abusive and said she hated the crowd and didn't want to go again and I should never ask her again." Another occurrence to which reference is made by Mr. Kendrick was a dinner at the Atlantic Yacht Club, at Seagate, when the witness was invited to take dinner with the libellant on a Saturday after-noon. The respondent expressed her desire to go to dinner whereupon the witness and the libellant looked for a table. There was some difficulty in getting one. The respondent was dissatisfied with the location of it and said: "I am not going to sit there. You may just as well cancel my order for dinner, and I am not going to have any more to do with you. You and John can go off and eat your own dinner. I will do without my dinner." The respondent had no recollection of the oc-currence, and the libellant himself said that he never gave a dinner to Kendrick there; that he had no recol-lection of him ever coming to Seagate. Another occur-rence which took place before the parties moved to New York in 1902 is made the subject of complaint. Mrs. Perrigo, a sister of the libellant, was at the Stratford hotel in Chicago with the libellant and his wife. They went to dinner at a "Bohemian place" where the libel-lant entertained a customer of his. Mrs. Abbott did not like the place "and she began to pass remarks about the place, and so finally it was a very strained atmosphere and we came home, and the party broke up. When we

got back to the Stratford, she was very indignant and
excited at Mr. Abbott. She said the guest was no more
than a Jew salesman, that he was no company, and she
would not walk on the street with them. That was the
end of that." It appears from the evidence that the per-
son whom he was to entertain was "a Jew from Cincin-
nati, engaged in the whiskey business." Mr. Abbott was
at that time an agent for the sale of whiskey. When
asked what was the expression Mrs. Abbott used in re-
gard to this restaurant, the witness replied: "I do not
remember the language she used excepting that it was a
place she did not want to be. Coming there incensed
her." The next morning the libellant brought a bottle of
whiskey to the room of the witness and they had a drink
and were laughing and enjoying themselves, and Mrs.
Abbott came in quite furious and took the bottle of
whiskey and emptied it into the toilet. She said that we
could not come together unless we drank. The libellant
said he didn't remember anything out of the way about
that particular occurrence. At a later time the same
witness asked Mrs. Abbott to come out and stay with
her during an operation she expected to have performed
at Milwaukee where she lived. Another occurrence in
Boston was described by Mr. Kendrick. He and another
man had been invited by the libellant to take dinner with
him soon after the parties were married, and the wife
did not appear on the occasion. Whether she was in-
formed that the dinner was to be given was not stated.
The same witness testified to an occurrence at the Wood-
ward hotel in New York, where Mr. Abbott and his wife
were living. Three young men from the White factory
in Cleveland came to Abbott's apartment. They were
there at the time Mr. Kendrick arrived. They were
drinking. "Mrs. Abbott was moving about the apart-
ment and sitting there and saying nothing to anybody.
Finally after Mr. Abbott had served one or two drinks
to these men and they were chatting about business, she
got up and said: 'I wish you would all get out of here.

I don't want you to turn my apartment into a drinking place, and do not like it at all. I think Mr. Abbott is half drunk now. When you are all through, I wish you would get out of here at once.'" The witness did not recall how much liquor had been used, but did not think more than a couple of "rounds" each. When asked to recall any other incidents, he replied: "I do not know. My recollection is of a series of incidents and they extend over a course of years." He stated that he knew Mr. Abbott tried to kiss his wife on one occasion, and Mrs. Abbott turned her head away and he walked out into the hall. The charge that the respondent called the witness's uncle a "dirty bum" was denied by the respondent who asserted that it was her husband who used this language. The witness, Mr. Kendrick, declined to answer the question whether his uncle was addicted to the use of liquor, but expressed the opinion that he was not. The charge of the use of profane and abusive language finds little support in the evidence except in the general statements of the libellant and Mr. Kendrick. When interrogated by his counsel on the subject, he testified: "Q. Did she ever curse you? A. She has on one or two occasions. Q. What were those things? A. Damn fool and no brains, etc." With respect to the charge of calling names, he testified as follows: "Q. Did she ever call you names? A. Oh, I could mention fifty. Q. Mention two or three? A. No good and lush." In the same connection, he testified that his wife told him fifty thousand times she was sorry she married him and that she cared nothing for him. Mr. Kendrick stated that on one occasion he was quite sure she had called her husband a dirty whelp. This is said to have occurred at the libellant's apartments when Mr. Kendrick was making a call. Mrs. Abbott criticised the libellant for locking himself in the bathroom when people were calling; on which occasion she "flew into a rage." Although numerous witnesses were called, the two last named were the only ones who undertook to support the charge

of the use of profane and vulgar language. Mr. Kendrick was a frequent caller at the house up to about the time they separated, and he testified that he did not recall any other incidents. His recollection extended over a course of years from which it may be inferred that he testified to all of the facts involved in the complainant's accusation which he could recall. Mrs. Abbott denied the charges then made and offered the evidence of her son and other witnesses as to her deportment in the presence of her husband in contradiction of the latter's contention that she was continuously abusive and indulged in improper language. There is convincing evidence that the libellant himself was addicted to profane and vulgar language. His own statement on the subject is exhibited in the following excerpt from the testimony: "Q. Mr. Abbott, on page 292, your wife testified as to your frequent use of profane and blasphemous language in her presence. What profanity did you use in the presence of Mrs. Abbott? A. Why, of course I have said possibly some time in my life some things that I should not have said. As Mr. Iverson told you, if you will remember, it was mostly directed at other people, for instance, a waiter. I never cursed and swore in front of her. I don't make a habit of doing that before women. I don't make a habit of going around and damning everything upside down in front of women. I have probably gotten mad and used some expressions." Dr. Bishop, a witness for the libellant who had attended the family professionally at different times, when asked whether he had observed the libellant act in an unmannerly way, replied: "That would all depend upon your definition of unmannerly. Mr. Abbott is not a very precise kind of person in a way." The respondent and Mr. Iverson testified as to the libellant's drinking habit—that this was a subject of criticism and that when he came into the presence of his wife under the influence of drink, he was profane and vulgar. According to Mr. Iverson, he used more blasphemous curses than any man

he had ever met. There is little room for the libellant to complain, therefore, if he offended in the respect of which he was complaining. The charge that the respondent was addicted to the use of habit forming drugs and constantly had been under their effect during her entire married life was not sustained by any evidence tending to show that she had such habit. Dr. Smith testified that he had treated her for violent headaches and that the only remedy which seemed to relieve the difficulty was morphine. This he administered eight or ten times in the course of about four years. Dr. Bishop testified that Mrs. Abbott was subject to "terriffic headaches and more or less nervousness at times." He further testified that he saw no evidence of a drug habit in the patient. The proofs are so at variance with the accusation as to give the impression that it was recklessly made.

The charge in the bill of particulars that the stepson caused unending friction between the libellant and respondent was not supported by any evidence, and the same may be said of the charge that the libellant was compelled to support him in idleness. In referring to these particulars we do not wish to be understood as assuming that they are evidence of indignities to the person if sustained. They tend to show rather the lack of substantial and important facts by which such a charge should be supported.

The accusation that the respondent had "continuously, repeatedly, openly, publicly, ostentatiously and with desire to embarrass, annoy and humiliate the libellant, accused him of improper relations with other women," is supported in the testimony of the libellant who refers to two dates when he says this occurred. The first time was in 1908 or 1909. On that occasion, he had received a letter in a woman's handwriting. When he opened it, his wife observing the fact asked him from whom it was. His explanation was apparently not satisfactory to her, and as he says, she

accused him of running around with other women. He declined to let his wife see the letter and destroyed it. The other time was the day when they separated in November, 1915. That was after he had become acquainted with Mrs. Pearson, and had been in her company from time to time as indicated by the evidence of the respondent. As he did not deny or explain the report that he and Mrs. Pearson were frequently together, it can hardly be said that he was without fault with respect to his wife's state of mind. If he gave her occasion to suspect his behavior, he cannot be heard to complain of that which his conduct provoked. John W. Kendrick, Jr., testified to two occasions when he was calling at the respondent's home; on the first of which in a conversation with Mrs. Abbott she said that her husband was not at home nearly as much as he used to be; that she didn't know where he was; that she thought he was running around with some women. On the other occasion, she said she had an idea that he was drinking around with a lot of women in the afternoon; that she was pretty sure of it from what she had heard. The date of these conversations is not given, but it was while they were living in New York. The statement of Mr. Kendrick was denied by the respondent, but when we consider the relation existing between the witness and the libellant, their close relation socially, the conversations attributed to the respondent, if expressed as stated by Mr. Kendrick, do not bear the appearance of having been used openly, publicly and ostentatiously and with a desire to embarrass and humiliate the libellant. They were conversations in the libellant's own home with the complainant's cousin and close friend about a subject in which the respondent had a deep interest. It was not unnatural, therefore, that she should talk to Mr. Kendrick on the subject if she had the well-grounded suspicions which she said she had. It cannot be doubted, as ascertained from the evidence, that the libellant's charge in this respect was greatly exaggerated, and there

is reason for concluding that some foundation existed for the respondent's complaint that he was associating with other women. That did not necessarily imply that he had committed adultery, however, although the respondent may have entertained that opinion. The complaint to her husband that he committed that offense, made in the privacy of their own home on information calculated to undermine her confidence in her husband, was not such an indignity as would support his action.

· That the parties had disputes from time to time appears from the evidence. The libellant says that they arose from the respondent's nagging and abusive disposition. The respondent attributes their trouble to his drinking, profanity and vulgarity. That the libellant was not free from blame may be inferred from his own admission. Referring to the removal from Boston to New York, he testified in response to a question of his counsel "we started in housekeeping and it was just the same atmosphere—the same atmosphere we had in Boston. Q. What do you mean by that? A. Unhappiness, quarrellings and debts. Q. Who quarrelled? A. She and I of course." At a later stage of the examination he was asked this question: "Q. Give one particular quarrel, state where it occurred, and what occurred, what she said and what you said? A. I cannot give you those dates. It is out of the question, because they were so often, and there was always a constant bickering about them. I can't think back just to the exact time." It seems a reasonable conclusion that the libellant took his own part in the discussions which arose between them. Some other occurrences were testified to which were unimportant as bearing on the charge which the libellant undertook to sustain. He spoke frequently of the respondent's extravagant habits and the cost of their manner of living, but it appeared that she made a very substantial contribution to their common fund out of her own estate, and there is nothing in the evidence from which the conclusion could be drawn that any element

of indignity to the person existed on account of extravagance.   We have considered the evidence at greater length because of the conclusion of the master and the learned judge of the court adversely to the appellant. The libellant's evidence was given in general terms and in many places stated in an extravagant manner, and the occurrences long past and evidently of little moment at the time are now reverted to as of serious consequence and important in the determination of the case.   The most of them long antedated the separation of the parties, and we cannot overlook the fact that they seem to have become more important about the time the libellant began to exhibit an interest in another woman.   The case should have been disposed of on the facts presented. The acts of the parties are to determine the merits of the controversy.   General accusations of a bad temper, of a nagging disposition and of disagreeable conduct towards relatives of the libellant, are not sufficient.   A complainant who seeks to secure a divorce on such a charge as that preferred by the libellant must establish a course of conduct by evidence of specific acts of sufficient importance and quality to make out a case.   Inferences, loose declarations, general allegations of ill-temper and abusive conduct fall short of this obligation: Ford v. Ford, 67 Pa. Superior Ct. 350.   We have failed to find in the mass of testimony presented to us evidence which is sufficient in quality or weight to support the libellant's case.   The master finds that the respondent is "extremely well-bred," but that she is "high-strung" and that her manner is "haughty" and that in his opinion any of the things which she did were done in a most positive way, strictly in accordance with her views of what was proper under the circumstances.   He was convinced, however, that she was absolutely honest in the most of her testimony, but that she was at fault in her recollection.   The libellant's witnesses he held were "men of the ordinary types of individuals" who would view the incidents referred to as extraordinary and

therefore more clearly remember them. Conceding this conclusion to be correct, the libellant is still bound to make out his case by a fair preponderance of the evidence, and he has fallen short of this measure of obligation.

The judgment is reversed and the bill dismissed at the cost of the libellant.