## Erlanger v. Erlanger.

*Divorce—Cruel and barbarous treatment—Indignities—Sufficiency of evidence—Uncorroborated testimony of libellant.*

1. In a libel for divorce by the husband for cruel and barbarous treatment and indignities to his person, the libellant must prove specific acts of sufficient importance and quality to make out a case.

2. General allegations, indefinite as to time or circumstance, and inferences and conclusions drawn by libellant, are insufficient as a basis for a decree; especially is this so where libellant's testimony is uncorroborated and denied by respondent, who is corroborated, to some extent, by her mother and sons, who said, in substance, that the respondent, in their presence, always treated the libellant in a proper manner.

3. That a wife, who was inordinately jealous of her husband, humiliated him by upbraiding him in abusive language in the presence of third persons touching his attentions to other women, is not, in itself, sufficient to establish either cruel and barbarous treatment or indignities to his person, where he had deserted her for a number of years, during which time he had been guilty of bigamy and had lived in adultery, a misconduct condoned by her, and had himself provoked her jealousy by paying marked attentions to other women after such condonation.

In divorce. Exceptions to master's report. C. P. No. 5, Phila. Co., March T., 1920, No. 1735.

*L. Bernstine*, for libellant; *Roy M. Livingstone*, for respondent.

MONAGHAN, J., Sept. 26, 1924.—The husband filed a libel, which contains two causes of divorce: Cruel and barbarous treatment and indignities to the person. The master found these charges substantiated by the testimony and recommended that a decree of divorce be granted. The respondent filed the exceptions now before us for determination.

The husband was twenty-two years of age and the wife was twenty-one when they were married in New York City on Sept. 14, 1903. Both of the parties were born in that city; they resided there at the time of the marriage and until 1917, when they removed to, and established residence in, Philadelphia. Here they lived continuously, with the exception of the summer months of 1918, when they were on a vacation at Delair, New Jersey, and in the same months of 1919, when they were on vacation at Wildwood, New Jersey, until Oct. 1, 1919, when the final separation occurred. The wife then returned to New York City, where she has since lived; the husband remained in Philadelphia.

Two children were the result of the union: Alfred, now nineteen years of age, and Norman, now sixteen.

The libellant's father, Nathan Erlanger, a man of affluence, died in 1906; by the terms of his will, one-fourth of the residue of his estate was devised and bequeathed to trustees, who were directed to apply the net income thereof to the support and maintenance of Arthur G. Erlanger (the libellant) during his lifetime, and upon his death to pay such share so held in trust to his issue *per stirpes* absolutely; excepting, however, that the trustees should, when the son, Arthur G., arrived at the age of thirty years, pay to him absolutely, and for his own use and benefit, the sum of $30,000 out of the one-fourth of the residuary estate.

The net income from the share of the estate amounted to approximately $400 per month; but this has, for reasons not explained, been apparently reduced. The libellant was, however, at all times since his father's death, in funds sufficient to maintain himself and family, and there do not appear to have been any real complaints by the wife touching lack of financial sup-

Erlanger v. Erlanger.

port by the husband. We have referred to the trust estate left by Nathan Erlanger because, in the course of the hearing before the master, the respondent several times said that she was contesting the suit to protect her children's expectant interest in their grandfather's estate; for, should her husband secure a divorce, he would probably remarry and might have other children, who would be entitled to an equal share with her children when the time for distribution arrived. Nevertheless, after an examination of all the evidence in the case, we cannot say that Mrs. Erlanger's motherly determination to protect her children has affected her credibility as a witness.

The testimony sheds very little or no light on the relations existing between the husband and wife from the date of their marriage in 1903 until 1909. The husband does say that within six months after the marriage the wife started to nag him and accused him of running around with other women; his allegations in that regard are extremely general, stale and uncorroborated; they are denied by the wife; and while they are thus not entitled to any evidential value, the gross misconduct of the husband would also tend to show that the wife's accusations prior to 1915 were in all probability well founded.

In 1909 the two children of the couple were respectively one and four years of age. The libellant admitted that he was away from his family, traveling in the south and west between 1909 and 1915, and that he did not communicate with his wife during that period. His admission, however, was but part of the truth; for it appears that on June 19, 1909, he married Hattie Davison, of New York, in Chatham County, Georgia; he thereafter cohabited with her, and two children were the result of the bigamous marriage. In 1916 he brought an action in New York to annul the marriage, on the ground that, when he married Miss Davison, he was already married to another woman (the respondent herein), then living and from whom he had never been divorced. The court found that Miss Davison did not know that he was a married man when she married him, and that two children were the result of the marriage. Judge Keogh, who presided, said, in his opinion filed in the case: "From the effect of his dishonorable conduct, he now asks the court to extricate him. If ever there was a case where a wrongdoer should be left to suffer the consequences of his misconduct, surely this is such a case," and the complaint was dismissed on its merits. Thereafter, Hattie Davison brought an action against the libellant in New York City, and judgment for $30,000 was entered in her favor against him on Dec. 20, 1917. On the night of that day, fearing the consequences of that adjudication, the libellant fled from New York to Cleveland, Ohio. From there he sent word to his wife to meet him in Philadelphia. The wife, with the children, immediately removed to Philadelphia, where they joined the libellant the latter part of December, 1917. Here the family lived together continuously until the summer of 1918, when they spent a vacation during the summer months in Delair, New Jersey.

We have examined the testimony with great care, and find that for the period of fifteen years from the date of the marriage until the summer of 1918 all charges of cruel and barbarous treatment or indignities to the person made against the wife rest solely upon the uncorroborated testimony of the husband. The libellant's description of the ill-treatment, which he said was accorded him by his wife during that period, is substantially as follows: "It started about six months after I was married, and she was discontented— she was constantly nagging me, and she was extremely jealous—when I left the house, when I would come home rather late sometimes, the first thing

Erlanger v. Erlanger.

that I would hear about from her was that she thought I had been out with other women—and it was so bad that at times I used to stay away and not come near the house—in the year 1917 she was continually nagging me, and whenever I tried to correct the children, she would side with them, and things got so bad that the boys started to cussing, both the boys, and they would call me a liar, and my wife would call me a damn fool, and the mother always stuck with the children in everything they said, and she seemed to try to get them to go against me, and that I should not have anything to say to them, and she always managed to have more to say than I did, and she would act this way towards me when we were out in public when lots of people were around, and lots of times she was so bad that I simply walked out, as I didn't want to start any fuss, and I would sometimes leave the table when we were eating and go without my meal on account of her actions. Finally, in the year 1918, we went to Delair, New Jersey, for our summer vacation, and she still kept up her constant nagging and accusing me of going out with quite a number of people—in the latter part of 1915 she grabbed me by the neck and tore my necktie and collar off and struck me over the face." From August, 1915, until Oct. 1, 1919, the libellant said that the wife struck him "at least two dozen times;" at one time she threw a mirror at him—she also threw hair-brushes at him approximately "two dozen" times, and used her hands or fists on him "a dozen times." Analysis of the testimony to which we have referred shows that it consists of general allegations, indefinite as to time or circumstance, and of inferences and conclusions drawn by the libellant; furthermore, the general allegations are testified to by the husband alone, and are uncorroborated, as far as they relate to the period from 1903 to the summer of 1918. The libellant also testified by similar general allegations to a continuous nagging by the wife, who, he said, repeatedly accused him of running out with other women, until Oct. 1, 1919, when the final separation occurred. The wife, however, has made a sweeping denial of all the general allegations of ill-treatment to which the husband testified. Her testimony in that regard receives some support in the testimony of her mother and of her two sons, who said in substance that the respondent, in their presence, always treated the libellant in a proper manner. All the general allegations of the libellant, under the circumstances, would be ineffectual to establish either of the causes alleged in the libel. A complainant who seeks to secure a divorce on such charges as those preferred by the libellant must establish a course of conduct by evidence of specific acts of sufficient importance and quality to make out a case. Inferences, loose declarations, general allegations of ill-temper and abusive conduct fall short of the obligation: Ford v. Ford, 67 Pa. Superior Ct. 350; Abbott v. Abbott, 75 Pa. Superior Ct. 483. We must be governed by facts, not conclusions or opinions of the witnesses: Richards v. Richards, 37 Pa. 225. General allegations, such as libellant has made, prove nothing. They are of no value unless accompanied by the actual facts on which the assertions are based. We are entitled in the consideration of the case to the particulars as to the words spoken or things done that constituted cruel and barbarous treatment or the indignities to the person. We can extend no sound judgment in such case without studying the acts complained of in their connection with the character of the parties: Aikens v. Aikens, 57 Pa. Superior Ct. 424; Ford v. Ford, 67 Pa. Superior Ct. 350; Abbott v. Abbott, 75 Pa. Superior Ct. 483; Parton v. Parton, 67 Pa. Superior Ct. 353; Forrester v. Forrester, 77 Pa. Superior Ct. 364; and, under all the authorities, to warrant a decree for divorce for the causes alleged in the libel, the evidence should be very clear and unambiguous. It is quite obvious that

the general allegations of the husband relating to ill-treatment by the wife from 1903 to the summer of 1918 are insufficient in quantity and in quality to justify a finding that the respondent had during that period been guilty of either cruel and barbarous treatment or of indignities to the person of the libellant.

Our next inquiry is whether the conduct of the libellant from the summer of 1918 and until Oct. 1, 1919, when the final separation occurred, was of a nature and character sufficient to establish the causes alleged in the libel.

The libellant ascribed jealousy on the part of the wife as a general cause for the ill-treatment she accorded him. In considering his charge of jealousy, we must bear in mind that for six years, from 1909 until 1915, the husband was guilty of the most flagrant violation of his marital obligation; he entered into a bigamous marriage with Hattie Davison in 1909, became the father of two children by her, and for six years did not communicate with his wife, who was during that period taking care of her two sons, then of tender age. When he was through with Miss Davison, he was audacious enough to file a petition to have his marriage with her annulled; and when she pressed him with litigation, he sought refuge with his wife, who stood loyally by him to the extent of leaving her home in her native city and re-establishing with him a new home in a strange city. The respondent, thus, did forgive her husband for his gross infidelity, but it should not be expected that she could or should forget that her husband had proved to be a man without honor or decency; that he was capable of practicing the most heinous deceit on innocent women and children; and that he had no scruples in living in open defiance of the canons of morality and the laws of the land when the strange woman excited his lust. The respondent, because of the past history of her husband, should not be blamed if she should question his marital fidelity thereafter on slighter circumstance than if he had been loyal to her; and we should not find fault with her if, for the protection of her home, she should warn or reprove him when she would observe him engaged in familiarities with other women. Furthermore, he must expect that any such familiarity, when made known to his wife, would be likely to provoke her into a rage of jealousy, accompanied by language of vituperation. If, then, the husband, knowing his past history, and also knowing the state of mind it had engendered in his wife, engaged in even slight familiarities with other women, his conduct would be the provoking cause of the retaliation naturally to be expected from his wife. While the retaliation on her part must not be excessive, we are not disposed, under the facts of this case, to blame her if she did not always use cool judgment when his actions with other women indicated to her that he was likely to depart from the path of virtue. The libellant has laid stress upon alleged misconduct of his wife while they were on vacation in Delair, New Jersey, in the summer months of 1918, and while they were on another vacation in the summer months of 1919, at Wildwood, New Jersey. In considering the wife's conduct during those two periods, we should have in mind the thoughts to which we have just given expression.

The libellant claims that in the summer months of 1918, while he and his family were on vacation in Delair, New Jersey, the wife's conduct towards him was unjustified. He made many general allegations of nagging, of the throwing of missiles and of accusations that he was running around with other women. His general allegations relating to that period are not, in our opinion, materially corroborated, and they are denied by the wife. He does testify, however, specifically to one incident that occurred in Delair. It appears that one night he left the boarding-house in which his family was staying

in order to buy a cigar. While on the road he met Mr. and Mrs. Friedman and Mr. Oppenheim, who were in an automobile. They invited him to join them in a ride to Palmyra. He accepted, and after a ride of about an hour and a-half, the parties returned to libellant's boarding-house in Delair. It was then 10.30 or 11 o'clock at night. Mrs. Erlanger met them on their arrival. Erlanger testified that she said to him, "You God-damned fool, you son of a bitch, if I had a gun I would shoot you;" and she called Mrs. Friedman a "dirty bitch and whore." There was not any other witness who was present on that occasion who testified that Mrs. Erlanger used the language ascribed to her. Mr. Oppenheim, who was present, testified that he could not hear Mrs. Erlanger because he was slightly deaf. Mr. Friedman swore that Mrs. Erlanger called Mrs. Friedman a "dirty bitch and whore," but he could not recall any language used by Mrs. Erlanger towards her husband. Mrs. Friedman testified that she could not recall the precise words spoken by Mrs. Erlanger, except that the latter called her a "bitch" and asked her "what she wanted with her husband" (Erlanger). Mrs. Friedman did not testify as to anything said by Mrs. Erlanger to the libellant. Florence Gerson, whose entire testimony impresses us as being that of an unduly eager and willing witness, said that Mrs. Erlanger called Mrs. Friedman "a damned bitch," and she also called Mr. Erlanger a "damned fool." The evidence to which we have referred unquestionably establishes that an exciting scene did take place, and that Mrs. Erlanger had, to say the least, called Mrs. Friedman a "bitch" and Mr. Erlanger a "damned fool." Mrs. Erlanger's version of the affair does not correspond with that of her husband or his witnesses. She testified that, on the afternoon preceding the occurrence, Mrs. Friedman, with whom she and her husband were acquainted, came into the Erlanger bedroom. Mrs. Erlanger was combing her hair; Mr. Erlanger was lying on the bed. Mrs. Friedman jumped on the bed and started fooling with him. This irritated Mrs. Erlanger, but she apparently said nothing at that time. In the evening, Mr. Erlanger joined Mr. and Mrs. Friedman in an automobile ride, without the knowledge of Mrs. Erlanger, who was not invited to accompany them, When the party returned about 10.30 or 11 o'clock P. M., Mrs. Erlanger admits that she was irritated because her husband, within a short time after the bedroom scene, associated with Mrs. Friedman on the automobile ride. She denies, however, that she called Mrs. Friedman by the opprobrious epithets to which the libellant and his witnesses testified, but admits that she did say to Mrs. Friedman, "You mean bum, keep away from my husband." Mrs. Friedman did not deny the incident described by Mrs. Erlanger as having taken place in the bedroom, but said that she does not remember any such scene. Erlanger did not deny that the bedroom incident occurred; he does not say anything in that regard. Under the state of the evidence concerning the bedroom incident, the weight would be with Mrs. Erlanger. If that incident occurred, the libellant should have known that his presence with Mrs. Friedman on an automobile ride the same night without his wife's knowledge would, on account of the recent behavior of Mrs. Friedman and his past transgressions, provoke the wife to hectic words and actions; and we cannot say that whatever she said or did to him on the occasion discussed was entirely without provocation on his part, innocent though he may have been of any wrongdoing with Mrs. Friedman. Furthermore, looking at the affair in its worst aspect as against the wife, it would be the only ill-treatment proven by the husband to have occurred during the first fifteen years of their married life. It was an isolated incident, and apparently, after it was over, the husband did not give it much weight, for he completed his vacation period with his wife in Delair and imme-

Erlanger v. Erlanger.

diately thereafter returned to Philadelphia and lived with his family until the beginning of the summer of 1919, when they went to Wildwood, New Jersey. True it is that the husband has made very general allegation of ill-treatment by the wife from the end of the summer of 1918 until the beginning of the summer of 1919. These uncorroborated allegations were denied by the wife, and are so general in their character that they prove nothing.

The libellant, however, lays great stress upon the behavior of the wife during the summer months of 1919, at Wildwood, as showing that she was inordinately jealous, and that, without any provocation, she did maliciously charge him in public with undue familiarity with other women. It appears that a Mrs. Kerr, a widow, and her daughter, then fifteen years of age, were guests of the hotel in which the libellant and his family were staying for the summer in Wildwood. The Kerrs were placed at the same table with the Erlanger family. Erlanger testified that he and his wife became well acquainted with the Kerrs, and as they walked to the beach he would accompany Miss Kerr. The respondent, he said, became insanely jealous of the girl, called him vile names and accused him of "going out" with Miss Kerr. Finally, on Sunday morning, Miss Kerr, her gentleman friend from Philadelphia and Erlanger walked to the beach. They were there but fifteen minutes when Mrs. Erlanger appeared and said to her husband: "Oh, is this the best you can do—you will not go in bathing with me—you God damned fool, wait until I get you home." Erlanger said he was embarrassed, and that thereafter Mrs. Erlanger made things so unpleasant for him that he was obliged to leave the dining-table. Mrs. Kerr testified that Mrs. Erlanger was insanely jealous of her daughter; that she heard the respondent call the libellant a damned fool, and she also heard her say that he was not capable of anything except running after "chickens." On different occasions, according to Mrs. Kerr's story, Mr. Erlanger was obliged to leave the dining-table on account of the misconduct of his wife. Mrs. Kerr further testified that she heard Mrs. Erlanger tell her children not to respect their father; and she also heard his son, as well as the respondent, call him "liar." The misconduct of Mrs. Erlanger, thus described, continued two weeks, according to Mrs. Kerr's testimony. Anna Kerr swore that she was never alone with Erlanger; that on one occasion, when she was on the beach with her male friend and the libellant, Mrs. Erlanger appeared and said to her husband, "You damn fool—I caught you with her again." Miss Kerr's testimony as to the conduct of Mrs. Erlanger at the dining-table is in substantial accord with that of her mother. The respondent, however, tells a different story concerning the Kerr incident. Miss Kerr, to her, looked older than fifteen years of age, and the libellant went out so frequently with Mrs. Kerr and her daughter that Mrs. Erlanger became very much disturbed about it, as the matter was becoming the subject of talk among the guests of the hotel. Furthermore, the respondent saw her husband and Miss Kerr on the beach; Miss Kerr's head was sometimes on libellant's lap and sometimes libellant's head was on Miss Kerr's lap. Mrs. Erlanger told her husband and Miss Kerr that the people at the hotel were talking about them, and requested Miss Kerr to leave her husband alone. The association of the libellant and the young girl became a matter of such public comment in the hotel that the respondent brought it to the attention of the landlady, who caused the Kerrs to be removed from the Erlanger dining-table. Norman Erlanger, son of the litigants, testified that on one occasion, when he was on the beach, he there saw his father lying on Miss Kerr's lap. After a thorough consideration of the evidence relevant to the Kerr incident, we are not convinced that the version of the affair as given to us by

Erlanger v. Erlanger.

the libellant and his witnesses is unbiased. The testimony of both sides is that the respondent made vigorous protests against the association of her husband with the young girl. The girl's mother testified that Mrs. Erlanger was insanely jealous of her daughter. The libellant has testified that his wife was always inordinately jealous. Why, then, in face of his wife's protests, did he continue to accompany the girl, when he knew such conduct was bound to inflame his wife into a jealous rage and provoke her to wild language and fevered actions? Mrs. Erlanger did not accuse the girl of any criminal relations with her husband, but she was not without reason to suspect that the association of her husband with the girl might lead to disaster to him, to their family and to the girl. We are of opinion that the circumstances of the Kerr incident point to the fact that Erlanger's behavior gave his wife reasonable grounds for suspicion, and he now cannot be heard to complain of that which his conduct provoked.

While on his vacation in Wildwood, in 1919, the libellant met, for the first time, Miss Frances Glassman, and shortly thereafter introduced her to his wife. When the Erlanger family were on the train, about to leave Wildwood for the summer, Miss Glassman boarded the car on which they were passengers. Mrs. Erlanger and her son both testified that the libellant greeted Miss Glassman with a kiss. Mrs. Erlanger did not say or do anything at that time. Miss Glassman and the libellant deny that they kissed each other. Within a short time after the Erlanger family had settled in Philadelphia, following their return from Wildwood, Mrs. Erlanger observed her husband and Miss Glassman holding conversation in the street; the respondent ran towards them and they ran away. Within a month after the return of the parties from Wildwood, the libellant claimed that on Oct. 1, 1919, without any warning and in his absence, the respondent left their home with her children and her belongings and removed to her mother's home in New York, where she and the children have since resided. Mrs. Erlanger, however, testified that her removal to New York was upon the request of the libellant. He had informed her that he had an opportunity to secure a position in Pittsburgh, and requested her to return, with her children, to her mother in New York, while he went to Pittsburgh. If he was successful there, he said he would send her word to join him in that city. Mrs. Hannah Wolf, the proprietress of the boarding-house in which the Erlanger family was living on Oct. 1, 1919, corroborates the story of the respondent. Mrs. Wolf, who was a disinterested witness and apparently a credible one, said that Mr. Erlanger, previous to the separation of Oct. 1, 1919, told her he was going to Pittsburgh to secure a position, and would meanwhile send Mrs. Erlanger home to her mother; if he met with success, he would send for Mrs. Erlanger to join him. The weight of the evidence is in favor of Mrs. Erlanger's version of the final separation; and the grave suspicion arises in our mind that Erlanger was endeavoring to get rid of his wife by a ruse, for he did not leave Philadelphia nor attempt to do so; and he did not communicate with his wife, but filed his libel in this case on March 9, 1920. Mrs. Erlanger has testified that he told her that when he received his decree of divorce, he was going to marry Frances Glassman. It was agreed by counsel that if Mr. Lynch were present at the hearing, he would testify that Erlanger also said to him that he intended to marry Miss Glassman when he obtained a decree of divorce; and it further appears that, at the first hearing, Mr. Erlanger admitted he was living in a boarding-house conducted by Mrs. Glassman, and that Frances Glassman resided in the same house. While Miss Glassman asserts that she never intended to and would not marry the libellant, the weight of the evidence favors a conclusion that

Erlanger did have serious intentions of marrying her should he be awarded a decree of divorce.

Having in view not only the circumstances surrounding the final separation, but also the known inclination and disposition of the libellant towards women other than his wife, we are constrained to believe that he is not in good faith prosecuting his suit for the causes he has alleged.

After a careful consideration of the case, we find that the libellant has not, by clear and satisfactory evidence, established the charges set forth in the libel.

The exceptions to the master's report are sustained and the libel is dismissed.