## Chesebrough v. Chesebrough.

*Divorce—Desertion—Break in continuity of desertion—Evidence.*

1. Assuming that an original desertion by a wife was wilful and malicious, the wife can, at any time before the expiration of two full years, break the continuity of the desertion, either by a *bona fide* offer to return or by a *bona fide* return to her husband.

2. Whether the continuity is broken by cohabitation for one or two days is to be determined by the master on a consideration of all the evidence in the case.

*Divorce—Residence—Jurisdiction—Residence in county.*

3. A mere legal residence in the State for one year, with actual residence out of it, is not sufficient to give jurisdiction to a Pennsylvania court in a divorce proceeding.

4. Residence in the county at the time of the filing of a libel in divorce is essential to give the court of the county jurisdiction.

Exceptions to master's report. C. P. Schuylkill Co., July T., 1923, No. 307.

*R. R. Koch,* for libellant.

BERGER, J., April 17, 1925.—This is an action of divorce charging desertion, brought here on exceptions to the master's report recommending the dismissal of the libel on the ground that the separation of the parties was by mutual consent. The libellant is employed by the J. G. White Management Corporation of New York as an electrical engineer, and came to Pottsville, Penna., Dec. 19, 1921, to do work in connection with the East Penn Electric Company

Chesebrough v. Chesebrough.

operating there, which is owned, managed or controlled by his employer. Before coming to Pottsville, he had worked for the same employer at Galveston, Texas, for two and one-half years, or until July, 1921, when he left there. Where he lived from July, 1921, after he had left Galveston, until he came to Pottsville, Dec. 19, 1921, has not been shown, although he said he had no other home than Pottsville since he left Galveston. On March 17, 1922, before a magistrate in New York City, he married Anna Sullivan, who was a nurse, or a student nurse, working in a hospital at New Haven, Conn. He returned to his apartment, 356 South Centre Street, Pottsville, Pa., on the day of his marriage, and his wife returned to New Haven, Conn., for a few days and then joined him at his apartment, where they lived together as man and wife until April 19, 1922. His wife had interrupted her training course as a nurse by marrying him and wanted to finish the course, to which he seemed to have no objection, because he endeavored to place her in the Pottsville Hospital for that purpose, but she, having been advised by Dr. Rogers, the chief surgeon there, that she could not get a certificate from that institution without taking the complete course, and that it would be better for her to complete her course at the institution where she had originally registered, returned to the West Haven Surgical and Maternity Hospital, West Haven, Conn., to resume and to complete her course of training. She told her husband of her intention to return April 18, 1922, and he requested her not to go, but she said she had come to a definite decision, was not happy in Pottsville, and nursing was "her calling in life," and left. Whether or not he was reconciled to her course of action before she left does not appear, but he contributed toward her support and went to New Haven in June, 1922, and stayed with her from Saturday to Tuesday morning "to resume our (their) relations," and he saw her there and asked her to return to Pottsville. She had not finished training, they quarreled, and she said "she would have nothing more to do with him," and he returned to Pottsville. While he was at New Haven his wife was living at the hospital, and on this visit he and his wife occupied one bed for two nights, one night at her mother's home and the other night at her sister's home. His wife later wrote to him at Pottsville that she would return, and when she returned in November, 1922, he met her at the car or train and they went to his apartment, which he had retained during her absence. She told him that she was compelled to give up her place at the hospital and that she wanted to live with him, but later said she was satisfied to return to New Haven. They stayed together in his apartment one night, but slept in separate beds. During a period of despondency, occurring in the night, over the loss of her position at New Haven, so he says, she took bichloride of mercury tablets and was removed to the Pottsville Hospital at his instance on the discovery of the resultant illness in the morning and her life was saved. While still at the hospital, her sister came on from New Haven in response to a telegram which he had sent her, and after about four days spent by his wife in the hospital, and before her full recovery, she decided to return to New Haven with her sister, although he told her she was welcome either to stay with him in Pottsville or to return to him at any time. Thereafter they appear never to have met, but maintained a correspondence, at least until Feb. 23, 1923. He kept no copies of his letters to her, nor did he testify to their substance, but he introduced in evidence three letters from his wife to him, dated Dec. 29, 1922, Jan. 25, 1923, and Feb. 23, 1923. Respecting her letters, he testified that the abuse heaped on him in them was unwarranted, but the letters themselves show that she suspected him of infidelity during the period of her absence from Pottsville because of information

received from others and probably from the contents of some of the letters which he wrote to her.

He is thirty-one years old. His father is dead and his mother has been traveling, and he testified that at the filing of the libel, June 2, 1923, and at the hearing before the master, Aug. 23, 1924, he was a citizen and resident of Pottsville, Pa., although on the latter date he was employed by the J. G. White interests in Oneonta, N. Y. Pottsville, he said, was the only settled place of abode he had ever established, although during his stay in Galveston, Tex., for a period of two and one-half years immediately prior to coming to Pottsville, he voted there and never voted elsewhere, and during his stay in Pottsville he did not register as a voter. His work with the J. G. White interests has always required him to travel about and over their various properties, and these, we know from the testimony, lie at least as far apart as Galveston, Tex., is from Oneonta, N. Y. The libel was sworn to in Pottsville, April 2, 1923, but was not filed until June 2, 1923, at which time the libellant was in Kentucky on a business trip of six weeks; but whether the business was of a private nature or in the interest of his employer, the J. G. White interests, has not been disclosed, and the period covered by the trip has not been shown. In December, 1922, the libellant gave up his apartment and took a room at 519 West Norwegian Street, and in May, 1923, he went on several trips and transferred "his belongings" to the Rennas Hotel, Pottsville, Pa. He never owned any furniture, and when he traveled he always took all his clothing with him. Since the libel has been filed, his work has been traveling, largely, and he has not stayed in excess of three weeks in any one town. His permanent mailing address is Pottsville, Pa., which he calls "home," because most of his friends live there, and he maintains his mailing address through a post-office box in the post-office at that place, and does his banking there. He has returned to Pottsville frequently, at irregular intervals, since June 2, 1923, on an average of at least once a month, but for what purpose, or where or how long he stays when he is in Pottsville, has not been told.

The five exceptions filed to the master's report resolve themselves into the single allegation that the evidence does establish a wilful and malicious desertion by the wife for and during the term and space of two years. The separation occurred April 18, 1922, and twice within the year, immediately preceding the filing of the libel, was interrupted by a reunion of the parties; first, for a period of three days in June, 1922, in New Haven, Conn., whence the husband had gone to see his wife, and there cohabited with her on two successive days in the homes of her mother and her sister, and next, when the wife, pursuant to a letter written to him, returned to Pottsville in November, 1922, and was received and treated by him as his wife for a period of at least four days. Assuming, for argument sake, that the original separation was a wilful and malicious desertion under the authority of Leonard *v.* Leonard, 67 Pa. Superior Ct. 412, and Smith *v.* Smith, 85 Pa. Superior Ct. 74, cited by appellant, the respondent could at any time before the expiration of two full years break the continuity of desertion, either by a *bona fide* offer to return or by a *bona fide* return to her husband: Gordon *v.* Gordon, 208 Pa. 186; Murray *v.* Murray (No. 2), 80 Pa. Superior Ct. 575, 577.

Schmidt *v.* Schmidt, 37 Montg. Co. Law Repr. 194, and Danforth *v.* Danforth (Maine), 33 Atl. Repr. 781, are cited by the libellant to establish the contention that the cohabitation for three days in New Haven, consummated by intercourse on two successive nights, and the later cohabitation in Pottsville for four days, not so consummated, does not break the continuity of the original desertion which he charges. In the first cited case, the original desertion of the wife by her husband occurred on Jan. 5, 1911, and when and after

Chesebrough *v.* Chesebrough.

she had found shelter in the house of friends April 4, 1911, the husband visited her there on Sept. 14, 1911, spent the night with her, left in the morning and never returned. From all the testimony in that case, the court properly found that the libellant had no intention to renew family relations with his wife; that his stay with her was with fraudulent intent; and that an allowance of his claim that the continuity of the desertion had been broken would permit him to profit by his own wrong. And in Danforth *v.* Danforth (Maine), 33 Atl. Repr. 781, the stay of the husband with his wife for three days during the period of desertion necessary to warrant a decree, though in good faith, was not followed by a reunion of the parties, as is the case here. La Flamme *v.* La Flamme, 210 Mass. 156, 96 N. E. Repr. 62, 39 L. R. A. (N. S.) 1133, may, upon further consideration of this case, lead the master to the conclusion that the continuity of the desertion was so broken as of itself to preclude the recommendation of a decree.

More important, however, than the question just discussed, is the question of jurisdiction. This court has no jurisdiction of the subject-matter if the libellant did not reside within this Commonwealth for one year previous to the filing of his petition or libel. The essentials which must be proved to establish the domicile of a libellant are succinctly stated in the syllabus to Gearing, Jr., *v.* Gearing, 83 Pa. Superior Ct. 423, thus:

"On a libel for divorce it must affirmatively appear that there has been a clear intention on the part of the libellant to abandon a former residence and to make Pennsylvania his permanent place of residence with domiciliary intent, coupled with an actual *bona fide* residence for one year within the Commonwealth previous to the filing of the petition or libel. Each requirement is essential and all must combine to warrant the courts in making a decree in divorce.

"A mere legal residence in the State with an actual residence out of it is not sufficient."

A case quite similar in its facts to the case at bar is Abbott *v.* Abbott, 75 Pa. Superior Ct. 483. See, also, Harrison *v.* Harrison, 69 Pa. Superior Ct. 580.

Residence in this county at the time of the filing of the libel was also essential to our jurisdiction: Mauser *v.* Mauser, 59 Pa. Superior Ct. 275, 281. The libellant was in Kentucky when his libel was filed June 2, 1923, and his work for the J. G. White interests in Pottsville probably had ceased before that time, and, so far as is shown by the evidence, he never worked in Pottsville after that date, nor thereafter had or maintained a fixed or established residence in Pottsville. Paragraph 15 of Rule 17, prescribing the duty of masters in divorce (Rules of Court, page 35), provides, *inter alia*, that "It shall be his duty, whether requested by either party or not, to summon and examine such witnesses as he may have reason to believe have knowledge of any matters relevant and material to the just and proper determination of the cause." The testimony in this case casts sufficient doubt upon the *bona fides* of the libellant's residence in the State one year immediately preceding the filing of his libel and in the county at the time of its actual filing to require the master to summon and examine witnesses who he may have reason to believe have knowledge of the libellant's residence in Pennsylvania and to recall the libellant for cross-examination on that point, along the lines indicated by the authorities hereinabove cited, and also to cross-examine him on the contents of his letters to his wife.

The case is referred to the master for further testimony upon the question of the jurisdiction of this court and the letters written by the libellant to his wife.                                   From M. M. Burke, Shenandoah, Pa.